FILED by KS D.C.

Apr 13, 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **21-60113-CR-MARRA/VALLE**

18 U.S.C. § 1349

UNITED STATES OF AMERICA

vs.

MOHAMED MOKBEL,
HOWARD FRANK,
PERFECTO HALLON,
and
JASON GRAMA,

           Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times material to this Indictment:

#### The Defendants

1. Defendant MOHAMED MOKBEL (MOKBEL) was an owner of Distinguished Pharmaceuticals, LLC, d/b/a Distinguished Pharmacy (Distinguished Pharmacy).

2. Defendant HOWARD FRANK (FRANK) was an owner of various businesses and pharmacies including: (a) Distinguished Pharmacy, (b) Physician Choice Pharmacy, LLC, (c) Wholesale Diabetic Supplies, Inc., (d) HMF Distributing Inc., and (e) E-Pharm Wholesalers, Inc.

3. Defendant PERFECTO HALLON (HALLON) was an owner of Medical Care Supplies, Inc.

4.     Defendant JASON GRAMA (GRAMA) was an owner of Physician Choice Pharmacy, LLC.

Business Entities

5.     Distinguished Pharmaceuticals, LLC d/b/a Distinguished Pharmacy (Distinguished Pharmacy) was a licensed retail pharmacy located in Harris County, Texas. Distinguished Pharmacy was owned by defendants FRANK and MOKBEL.

6.     Physician Choice Pharmacy, LLC (Physician Choice Pharmacy) was a licensed retail pharmacy located in Broward County, Florida. Physician Choice Pharmacy was owned by defendants FRANK and GRAMA and another individual (Individual 1).

7.     Wholesale Diabetic Supplies, Inc. was a business located in Broward County, Florida, that bought and sold wholesale diabetic supplies. Wholesale Diabetic Supplies, Inc. was owned by defendant FRANK.

8.     HMF Distributing, Inc. was a business located in Broward County, Florida, that bought and sold wholesale diabetic supplies. HMF Distributing, Inc. was owned by defendant FRANK and another individual (Individual 2).

9.     Medical Care Supplies, Inc. was a business located in Broward County, Florida, that bought and sold wholesale diabetic supplies. Medical Care Supplies, Inc. was owned by defendant HALLON and another individual (Individual 3).

10.    E-Pharm Wholesalers, Inc. (E-Pharm) was a business located in Broward County, Florida, that bought and sold wholesale diabetic supplies. E-Pharm was owned by defendant FRANK and another individual (Individual 4).

### Diabetes and Testing Glucose Levels

11. Diabetes is a chronic disease characterized by high blood glucose (sugar) levels that result from defects in the body's ability to produce and use insulin. Diabetes is a disease which must be managed closely to avoid the risk of serious illness, complications, and even death. Blood glucose test strips, also known as diabetic test strips (hereafter "diabetic test strips"), were used by patients with diabetes and pre-diabetes to monitor their blood sugar enabling them to regulate their diet and medication.

12. Diabetic test strips were considered "medical devices" and were regulated by the United States Food and Drug Administration (FDA).

13. A doctor's prescription was needed for diabetic test strips to be reimbursed by the patient's healthcare benefit plan.

### National Drug Code

14. In the United States, medical devices, including diabetic test strips, that were available through pharmacies and potentially eligible for reimbursement from healthcare benefit plans, were identified and reported using a unique, three-segment number, called the National Drug Code (NDC). The NDC served as a universal product identifier for drugs and other medical products. The NDC was present on non-prescription (over the counter) and prescription medication packages and inserts in the United States, including those for diabetic test strips. The three segments of the NDC identified the manufacturer (labeler), the product, and the commercial package size. Only products made for dispensing within the United States had a NDC. Some diabetic test strips had their NDC numbers included in the product's bar code.

15. The healthcare benefit plans used the NDC number to identify the covered item dispensed by the provider pharmacy to the covered plan member. The NDC was required for reimbursements from healthcare benefit plans.

16. Healthcare providers and pharmacies made claims for reimbursement to patients' healthcare benefit plans. In submitting a claim for reimbursement, providers had to include the correct NDC number. Claims submitted utilizing an NDC number other than the NDC number of the dispensed item were not eligible for reimbursement from the healthcare benefit plan.

17. Pharmacy Benefit Managers were third party administrators of prescription drug programs for commercial health plans, self-insured employer plans, and federal employees' health benefit programs. Pharmacy Benefit Managers were responsible for processing and paying prescription drug claims, including claims for diabetic test strips, developing and maintaining the list of covered drugs and devices (the formulary), contracting with pharmacies, negotiating discounts and rebates with drug and device manufacturers, and processing and paying claims for reimbursement. OptumRx, CVS Caremark, Express Scripts, and Catamaran were Pharmacy Benefit Managers and they processed and paid claims for various healthcare benefit plans including: BlueCross/BlueShield, Coventry Healthcare, AvMed, Universal American and Aetna.

18. Physician Choice Pharmacy and Distinguished Pharmacy dispensed diabetic test strips. For each of the years 2013 through 2016, Physician Choice Pharmacy and Distinguished Pharmacy entered into provider agreements with various Pharmacy Benefit Managers.

19. Under the terms of the provider agreements between the healthcare benefit plans and pharmacies, pharmacy owners were required to submit claim information, including the NDC, that was accurate and complete. The pharmacy owners further agreed that claims submitted utilizing an NDC other than the NDC of the dispensed item were not eligible for reimbursement.

As pharmacy owners, defendants MOKBEL, FRANK, and GRAMA were required to submit accurate and complete claim information.

## Markets for Diabetic Test Strips

20. Manufacturers of diabetic test strips produced diabetic test strips labeled for three separate markets: (1) "retail," (2) "non-retail," and (3) "foreign" diabetic test strips.

**The domestic retail market:**

21. Retail diabetic test strips were intended to be distributed in the United States, and must have been reviewed and cleared by the FDA for marketing before distribution. Retail diabetic test strips were sold in the retail market, including pharmacies, and were billed through government and private health care benefit plans.

**The domestic non-retail market:**

22. Non-retail diabetic test strips were intended to be distributed in the United States and must have been reviewed and cleared by the FDA for marketing before distribution. Non-retail diabetic test strips were distributed to hospitals, health clinics, and supplied to healthcare benefit plan members by mail order pharmacies or durable medical equipment suppliers. Non-retail diabetic test strips included one or more of the following statements on their respective labelling: "Not For Retail Sale;" "Mail Order;" "Mail Order Only;" "Exclusively for Mail Order Use;" "Not for Sale in Retail Outlets;" "Not for Store Sale;" "Health Plan/Contract;" DME/Medical Benefit;" "For Institutional Use Only;" "Limited Medicare/Medicaid Beneficiary Use Only;" "Health Plan Medical Benefit Patients;" "For DME Beneficiaries Only;" and "DME Only." Non-retail diabetic test strips, were sold for significantly less than retail diabetic test strips.

**The foreign market:**

23. Foreign diabetic test strips were manufactured to be sold and used outside the United States. Foreign diabetic test strips were priced significantly less than similar test strips sold in the United States. Diabetic test strips that were intended for distribution outside of the United States bore labeling specifically designed for the destined country and were labeled differently than diabetic test strips sold in the United States. Foreign diabetic test strips were not reviewed and cleared by the FDA.

<u>Payment for Diabetic Test Strips</u>

24. Healthcare Benefit Plans and Pharmacy Benefit Managers were "health care benefit programs" as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item, or service is provided to any individual."

25. To submit a claim to a healthcare benefit plan for retail diabetic test strips, a pharmacy must have been accepted by the healthcare benefit plan as a licensed retail pharmacy, obtain a prescription from a licensed physician, and bill the healthcare benefit plan or Pharmacy Benefit Managers utilizing the NDC number.

<u>**Count 1**</u>
**(Conspiracy to Commit Health Care Fraud)**
**18 U.S.C. § 1349**

26. Paragraphs 1 through 25 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

27. From May 2013 and continuing into November 2016, the exact dates being unknown to the grand jury, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

MOHAMED MOKBEL,
HOWARD FRANK,
PERFECTO HALLON,
and
JASON GRAMA,

did knowingly and willfully combine, conspire, confederate, and agree with each other and others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, in connection with the delivery of and payment for health care benefits, items, and services, to execute and attempt to execute, a scheme and artifice: (a) to defraud health care benefit programs, as defined by Title 18, United States Code, Section 24(b); and (b) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, any of the money and property owned by, and under the custody and control of, health care benefit programs.

## OBJECT OF THE CONSPIRACY

28. It was the object of the conspiracy for the defendants to unlawfully enrich themselves and others, by fraudulently billing and causing healthcare benefit programs to be fraudulently billed for non-retail and foreign diabetic test strips as if they were the more expensive domestic retail diabetic test strips and thereby obtained inflated reimbursements to which the defendants were not entitled.

## MANNER AND MEANS OF THE CONSPIRACY

29. The manner and means by which the defendants sought to accomplish the object of the conspiracy included, among other things, the following:

   a. Defendants acquired non-retail and foreign diabetic test strips through various sources at significantly less cost than the retail value. Defendants also acquired invoices, purchase orders, and shipping records that accompanied the non-retail and diabetic test strips.

  b. Defendants and some of their employees altered the invoices, purchase orders, and shipping records of the non-retail and foreign diabetic test strips to deceive subsequent buyers about the legitimacy of the supply chain and to deceive auditors and inspectors.

  c. Defendants and some of their employees created false NDC numbers, altered original NDC numbers, altered bar codes, altered labeling, altered accompanying documentation and concealed the fact that the products were non-retail and foreign diabetic test strips.

  d. The alterations made by the defendants and some of their employees included: (1) removing the original patients' prescription labels from a box of prescription diabetic test strips by "washing" them with cotton balls, Q-tips, rags with paint thinner, finger nail polish remover, lighter fluid and "Goo Gone"; (2) affixing stickers that defendants had ordered that concealed the labeling since most non-retail diabetic test strips contained labeling on their packaging that identified them as non-retail diabetic test strips, such as "mail order only" or "not for retail sale"; and (3) purchasing NDC numbers, bar codes, "Thank You" stickers, and other stickers from printing companies and using them to cover and mask the actual origin of the non-retail and foreign diabetic test strips.

  e. Defendant MOKBEL instructed co-defendants FRANK and HALLON and some of their employees to ship "mail order only" diabetic test strips to an individual who obtained counterfeit diabetic test strip boxes. Defendants instructed that individual to place "mail order only" diabetic test strips inside the counterfeit retail diabetic test strip boxes, and then instructed the counterfeit diabetic test strips to be shipped to Distinguished Pharmacy.

  f. Defendant MOKBEL and his employees received and sold boxes of diabetic test strips at Distinguished Pharmacy that bore stickers with NDC numbers and bar codes that did not correspond to the actual boxes of diabetic test strips that defendant MOKBEL received.

g.   Defendant GRAMA and his employees received and sold boxes of non-retail diabetic test strips at Physician Choice Pharmacy that were covered with "Thank You"; "Physician Choice Pharmacy"; NDC; and bar code stickers, which concealed or altered original information on the boxes.

h.   Defendants FRANK and HALLON and their employees shipped boxes of non-retail and foreign diabetic test strips to Distinguished Pharmacy, Physician Choice Pharmacy and other pharmacies, that bore stickers with NDC numbers and bar codes that did not correspond to the actual boxes of diabetic test strips that they had shipped.

i.   Defendants and some of their employees sold diabetic test strips in boxes bearing false and altered information to retail pharmacies, and other wholesalers and distributors.

j.   Defendants and some of their employees shipped packages of non-retail and foreign diabetic test strips, labeled as retail, to customers.

k.   Defendants and some of their employees created invoices containing false information for the sale of foreign diabetic test strips, or counterfeited their packaging to mask their origin, since foreign diabetic test strips did not contain NDC numbers.

l.   Defendants sold non-retail and foreign diabetic test strips as if they were domestic retail diabetic test strips, and billed the healthcare benefit plans through Pharmacy Benefit Managers as if the test strips were domestic retail diabetic test strips. Distinguished Pharmacy, Physician Choice Pharmacy, and other pharmacies owned by defendants, submitted claims for reimbursement for diabetic test strips, to healthcare benefit plans through Pharmacy Benefit Managers including: OptumRx, CVS Caremark, Express Scripts, and Catamaran, seeking reimbursement as if they had provided more expensive retail test strips when they had provided less expensive non-retail and foreign test strips.

m.    In an effort to conceal the fraud, defendants MOKBEL, FRANK, HALLON and GRAMA, caused payments to be made to other entities which they controlled, to make it appear as if they were purchasing diabetic test strips from other businesses.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

1.    Upon conviction of a violation of Title 18, United States Code, Section 1349, as alleged in Count 1 of this Indictment, the defendants, **MOHAMED MOKBEL, HOWARD FRANK, PERFECTO HALLON,** and **JASON GRAMA**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property real or personal, which constitutes or is derived from proceeds traceable to such violation.

All pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853.

A TRUE BILL

FOREPERSON

_____
JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

_____
LAURENCE M. BARDFELD
ASSISTANT U.S ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

Mohamd Mokbel,
Howard Frank, et al.

_____ Defendant _____ /

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)
- ___ Miami
- ✓ FTL
- ___ Key West
- ___ WPB
- ___ FTP

New defendant(s)          Yes ___   No ___
Number of new defendants  ___
Total number of counts    ___

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect _____

4. This case will take _7-8_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I   0 to 5 days       ___           Petty    ___
   II  6 to 10 days      ✓             Minor    ___
   III 11 to 20 days     ___           Misdem.  ___
   IV  21 to 60 days     ___           Felony   ✓
   V   61 days and over  ___

6. Has this case previously been filed in this District Court?   (Yes or No)   No
   If yes: Judge _____   Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   (Yes or No)   No
   If yes: Magistrate Case No. _____
   Related miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the District of _____

   Is this a potential death penalty case? (Yes or No)   No

7. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?   Yes ___   No ✓

8. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   Yes ___   No ✓

9. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   Yes ✓   No ___

_____
Laurence M. Bardfeld
ASSISTANT UNITED STATES ATTORNEY

*Penalty Sheet(s) attached

REV 6/5/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: MOHAMED MOKBEL        **Case No**: _____

Count: 1

Conspiracy to Commit Health Care Fraud

18 U.S.C. § 1349

\* **Max. Penalty:** Ten (10) years' imprisonment; three (3) years' supervised release; $250,000 fine.

Count:




\***Max. Penalty:** .

Count:




\***Max. Penalty:**

Count:




\***Max. Penalty:**

Count:




\***Max. Penalty:**

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: HOWARD FRANK   **Case No**: _____

Count: 1

Conspiracy to Commit Health Care Fraud

18 U.S.C. § 1349

*** Max. Penalty:** Ten (10) years' imprisonment; three (3) years' supervised release; $250,000 fine.

Count:



**\*Max. Penalty:** .

Count:



**\*Max. Penalty:**

Count:



**\*Max. Penalty:**

Count:



**\*Max. Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: <u>PERFFECTO HALLON</u>　　　　　　　**Case No**: _____

Count: 1

<u>Conspiracy to Commit Health Care Fraud</u>

<u>18 U.S.C. § 1349</u>

**\* Max. Penalty**: <u>Ten (10) years' imprisonment; three (3) years' supervised release; $250,000 fine.</u>

Count:

_____

_____

**\*Max. Penalty:** ._____

Count:

_____

_____

**\*Max. Penalty:** _____

Count:

_____

_____

**\*Max. Penalty:** _____

Count:

_____

_____

**\*Max. Penalty:** _____

　　　\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: JASON GRAMMA           **Case No**: _____

Count: 1

Conspiracy to Commit Health Care Fraud

18 U.S.C. § 1349

\* **Max. Penalty:** Ten (10) years' imprisonment; three (3) years' supervised release; $250,000 fine.

Count:



**\*Max. Penalty:** .

Count:



**\*Max. Penalty:**

Count:



**\*Max. Penalty:**

Count:



**\*Max. Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.